UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:

PREMIER AGGREGATES, LLC,                    NO. 09-10541

        Debtor                              CHAPTER 11

                                            SECTION "A"

---

R. PATRICK VANCE, TRUSTEE FOR THE
ESTATE OF PREMIER AGGREGATES, LLC          ADVERSARY PROCEEDING
                                           NO.
VERSUS

KEVIN SCHMIDT, CAPITOL AGGREGATES, LLC,    SECTION "A"
AND JACK SINGLETON

---

## ADVERSARY COMPLAINT

**NOW INTO COURT** comes the Trustee, R. Patrick Vance, Trustee for the Estate

of Premier Aggregates, LLC, who respectfully represents as follows:

1.      This Court has jurisdiction of this adversary proceeding pursuant to 28

U.S.C. §§ 157 and 1334.

2.      Venue is proper in this Court pursuant to section 28 U.S.C. § 1409(a).

## THE PARTIES

3.      Premier Aggregates, LLC ("Premier") is a Louisiana limited liability

company formed by Denise M. Bankston on August 9, 2007.

4.      Premier's Articles of Incorporation and Initial Report were filed and recorded with the Louisiana Secretary of State on August 13, 2007.

5.      An involuntary bankruptcy petition against Premier (this "Case") was filed on February 27, 2009 in the United States Bankruptcy Court for the Eastern District of Louisiana, case number 09-10541.

6.      An order for relief pursuant to 11 U.S.C. § 303 was entered against Premier in this Case on May 21, 2009.

7.      R. Patrick Vance was duly appointed the Trustee of the Estate of Premier in this Case on June 11, 2009.

8.      Defendant, Kevin Schmidt ("Schmidt"), is a resident of Caddo Parish, Louisiana.  He is a member and manager of Premier.

9.      Defendant, Capitol Aggregates, LLC ("Capitol"), is a limited liability company domiciled in Slidell, St. Tammany Parish, Louisiana.  Capitol is a member of Premier.

10.     Defendant, Jack Singleton ("Singleton") is an individual of the full age of majority and a resident of, and domiciliary of, Slidell, St. Tammany Parish, Louisiana. Singleton is and was a manager of Premier.

11.     Denise M. Bankston ("Bankston") who is not named as a defendant herein solely since she is a debtor-in-possession in the bankruptcy case filed in the Western District of Louisiana, case number 09-10675, was the 100% owner of Premier as of the date of the commencement of Premier's business.  Bankston is and was member and manager of Premier.

## GENERAL ALLEGATIONS

12.    Premier commenced operations on August 22, 2007.  Bankston was the 100% owner of Premier as of that date.

13.    Bankston transferred 50% of her ownership interest in Premier to Capitol on October 18, 2007.

14.    Bankston transferred 25% of her ownership interest in Premier to her son, Schmidt, on October 18, 2007.

15.    An Operating Agreement of Premier was executed on October 18, 2007 by the members (the "Premier Operating Agreement").

16.    As a result of the execution of the Premier Operating Agreement, the members of Premier were:

> (a)    Bankston;
> (b)    Schmidt; and
> (c)    Capitol,

and the managers of Premier were:

> (a)    Bankston;
> (b)    Schmidt; and
> (c)    Singleton.

17.    Capitol is 100% owned by Christine Singleton, Jack Singleton's spouse. Jack Singleton is the manager of Capitol.

18.    The Premier Operating Agreement requires unanimous consent from each of the three managers of Premier before any legitimate actions can be taken.

19.    For example, in order for any one of the managers to execute any contracts necessary or convenient in connection with the business of Premier, all managers must have consented to the contract.

20.     Section 6.4.1 of the Premier Operating Agreement provides that "in order for the managers to act in accordance with Section 6.3 no single Manager may act alone but must seek and have the consent of the remaining duly elected Managers." Section 6.3.1 of the Premier Operating Agreement provides that the Managers are hereby specifically authorized, in the name of the Company, to execute and deliver "agreements, contracts, documents . . . in connection with the business and affairs of the Company."

21.     The members and managers of Premier were engaged in the business of operating a gravel pit located in Fluker, Louisiana in Tangipahoa Parish.

22.     Singleton was on site at the gravel pit in Fluker on a daily basis and was actively engaged in the management of the Premier business.

23.     Schmidt was on site at the gravel pit in Fluker on a daily basis and was actively engaged in the management of the Premier business.   Indeed, Schmidt informed one of Premier's largest creditors, Community Trust Bank, that he intended to be present at the gravel pit on a daily basis and be active in the day to day management of the gravel pit.

24.     Schmidt, who acted on behalf of his and his mother's interests, was on site at the gravel pit on a regular basis and was actively engaged in the management of the Premier business.

25.     Schmidt and Bankston controlled Premier's books, records and finances. At all material times, all payments for Premier's expenses were made by check or by wire transfer out of Schmidt's and Bankston's office located at 216 Texas Street in Shreveport, Louisiana in Caddo, Parish.

26.    At all material times, all payments for goods sold by Premier's were sent directly to 216 Texas Street in Shreveport and deposited in Premier's bank accounts.

27.    At all material times, Schmidt and Bankston had complete control over both the payment of expenses and accounts payable and the collection of accounts receivables.

28.    In the first seven months of Premier's operations, August 2007 to March 2008, Premier lost approximately four million dollars ($4,000,000.00).

29.    During this period of time and afterwards until Premier's business ceased operations on or about May 16, 2008, Bankston, Schmidt, Singleton and Capitol continued to incur substantial obligations on behalf of Premier, which they knew that Premier could not pay.

30.    Bankston and Schmidt ignored corporate formalities and treated Premier as an alter ego of their other financial and/or business interests.

31.    Bankston and Schmidt drew down on lines of credit not intended or extended to Premier and infused capital into Premier without following corporate formalities or the Premier Operating Agreement.  In so doing, Schmidt breached his fiduciary duties to Premier, including his duty of care, and is guilty of bad faith.

32.    Bankston and Schmidt have caused payments to be made by Premier for Bankston's personal obligations.  In so doing, Schmidt breached his fiduciary duties, including his duties of care and loyalty, and is guilty of bad faith.

33.    These actions were not in compliance with the Premier Operating Agreement and, based on information and belief, were taken without the consent of

Singleton or Capitol. As such, the actions were in violation of Schmidt's fiduciary duty of care and were in bad faith.

34.    Capitol and Singleton acted without proper authority in executing a lease of real property, hiring personnel, and obtaining for Premier (or failing or refusing to return) unnecessary equipment

35.    Pursuant to LA R.S. 12:1314(A)(1), a manager of a limited liability company stands in a fiduciary relationship to the LLC and its members, and he shall discharge his duties in good faith, with diligence, care and judgment, and skill of an ordinary prudent person in the best interest of the company.

36.    The breaches of Bankston, Schmidt, Singleton and Capitol have caused Premier to suffer substantial and massive financial damages.

37.    Bankston did not fulfill her duties and obligations as Premier's manager, and instead "trusted" Schmidt and Singleton to perform her duties and obligations as manager.

38.    Bankston attempted to delegate many of her duties and obligations as a manager of Premier to her son, Schmidt, and relied on him to protect her interests.

39.    Bankston and Schmidt acted in concert with each other in carrying out their respective duties and obligations as Premier's managers.

40.    Singleton and Capitol acted in concert with each other in carrying out their respective duties and obligations as a manager and member of Premier.

41.    Premier's managers bickered among themselves and did not discharge their duties in good faith, with diligence, care, judgment, or skill of an ordinary prudent person in the best interest of Premier.

42.    Each of the managers failed to followed the mandates of the Premier Operating Agreement to seek and obtain the consent of the remaining Premier managers to make business decisions for Premier.

43.    Bankston, Schmidt and Singleton as managers of Premier engaged in gross mismanagement in breach of their respective fiduciary duties owed to Premier and to each other, causing massive and severe damage to Premier and its creditors.

44.    In April, 2008, Bankston and Schmidt developed a pro forma for Premier's operations that "conservatively" concluded that Premier would net seven million dollars ($7,000,000.00) by the end of 2008 and thereafter annually.

45.    Bankston also hired as her personal CPA, Chad Garland, to review Premier's books and records to determine why Premier was losing money, her projections of seven million dollars ($7,000,000.00) in annual net profits notwithstanding.

46.    Garland reached conclusions about Premier's business operations after a brief study of the finances that each of Premier's managers should have realized months earlier.

47.    At a meeting on April 24, 2008, Garland made recommendations to the managers that were designed to make Premier profitable.

48.    Singleton, on the one hand, and Bankston and Schmidt, on the other, had a difference of opinion about Garland's recommendations.

49.    On May 4, 2008, Bankston and Schmidt proposed to Singleton that the 50% interest in Premier held by Capitol be transferred to Bankston.

50. On May 14, 2008, Singleton and Capitol filed suit ("*Petition for Damages and Receivership*") against Bankston, Singleton and Premier, in Tangipahoa Parish, Louisiana, 21st Judicial District Court, docket number 2008-0001503-A (the "Receivership Action").

51. In the Receivership Action, Singleton and Capitol alleged that both Schmitt and Bankston had violated the terms and conditions of the Premier Operating Agreement, and requested the appointment of a receiver on an "interim basis," while the members attempted to utilize the buy/sell procedures for equity interests that are set forth in the Premier Operating Agreement.

52. Thereafter, Singleton vacillated about whether Capitol would buy out Bankston's interest or whether Bankston would buy out Capitol's interest.

53. On information and belief, Singleton decided that Bankston was trying to take advantage of the situation by offering to pay less than the fair value of Premier.

54. On May 21, 2008, Capitol tried to initiate a buy out of Bankston's interests in Premier.

55. On June 27, 2008, Bankston and Schmidt filed suit (*Petition for Indemnification, Dissolution, and Damages*) against Singleton, Capitol and Premier, in Caddo Parish, Louisiana in the 1st Judicial District Court, docket number 522491B (the "Dissolution Petition"), and sought dissolution of Premier.

## FIRST CAUSE OF ACTION

### (The Scheme to Take Over Control of Premier-Schmidt)

56.    The Defendant in the First Cause of Action is Schmidt.

57.    The Trustee incorporates the following Paragraphs of this Complaint in this Cause of Action:   Paragraphs 1 through 33; Paragraphs 32 through 39; and Paragraphs 41 through 55.

58.    In addition, on information and belief, Schmidt and Bankston decided that rather than buy Capitol's interests in Premier, they would force Capitol and Singleton out of the business by terminating Premier's operations.

59.    On information and belief, Schmidt and Bankston decided that they would put Premier in bankruptcy and/or dissolve and wipe out Capitol's equity interest.

60.    Schmidt and Bankston filed the Dissolution Petition on June 27, 2008, and sought to dissolve Premier.

61.    On information and belief, Schmidt and Bankston intended to reopen the gravel pit after forcing Capitol and Singleton out of the business.

62.    On information and belief, Schmidt, on behalf of himself and Bankston, contacted some of Premier's larger customers and determined that those customers would work with them in a new business after bankrupting and/or dissolving Premier.

63.    These actions by Schmidt, on behalf of himself and Bankston as Premier's members and managers, intentionally breached his fiduciary duties of care and loyalty to Premier.

64.    Schmidt, on behalf of himself and Bankston, intentionally undertook a course of conduct to deliberately take over the entire ownership of Premier and, in so

doing, Schmidt intended to dissolve and/or bankrupt Premier to the detriment of Premier and its creditors.

65.    The actions of Schmidt, on behalf of himself and Bankston as Premier's members and managers, were in bad faith because he knew that injury would be inflicted on Premier and its creditors.

66.    Schmidt placed his and his mother's self interests above the interests of Premier, and in doing so, willfully and maliciously injured Premier and its creditors.

67.    The actions of Schmidt were intentional and designed to injure Premier and its creditors.

68.    The breaches of Schmidt have caused Premier to suffer substantial and massive financial damages, as set for the in the prayer herein.

## SECOND CAUSE OF ACTION

### (The Scheme to Take Over Control of Premier-Singleton and Capitol)

69.    The Defendants in the Second Cause of Action are Singleton and Capitol.

70.    The Trustee incorporates the following Paragraphs of this Complaint in this Cause of Action:  Paragraphs 1 through 22; Paragraphs 28 and 29; Paragraphs 34 and 35; and Paragraphs 40 through 55.

71.    In the Dissolution Petition, Schmidt and Bankston allege that Singleton and Capitol were engaged in conduct designed to drive Bankston out of Premier, and then take advantage of Capitol's majority position in order to wreck havoc upon Schmidt as a remaining minority interest holder.

72.     Any such actions by Singleton and Capitol constitute bad faith and a breach of Singleton's and Capitol's fiduciary duties, since both Singleton and Capitol knew that injury would be inflicted on Premier and its creditors.

73.     If such actions were undertaken, Singleton and Capitol would have been placing their self interests above the interests of Premier, and in doing so, Singleton and Capitol would have been willfully and maliciously causing injury to Premier and its creditors.

74.     Any such breaches of Singleton and Capitol have caused Premier to suffer substantial and massive financial mages, for which Singleton and Capitol are each liable, as set for the in the prayer herein.

## THIRD CAUSE OF ACTION

### (An Additional Breach of the Duty of Loyalty; Schmidt)

75.     The Defendant in the Third Cause of Action is Schmidt.

76.     The Trustee incorporates the following Paragraphs of this Complaint in this Cause of Action: Paragraphs 1 through 33; Paragraphs 32 through 39; and Paragraphs 41 through 55.

77.     After Premier terminated its business operations on or about May 16, 2008, Schmidt and Bankston, who continued to have complete control over Premier's bank accounts, directed that certain payments be made from Premier's bank accounts (collectively, the "Sovereign Payments") to Sovereign Bank for a loan that Sovereign Bank made to Bankston in her individual capacity (the "Bankston/Sovereign Bank Loan"). Premier was never liable for any portion of the Bankston/Sovereign Bank Loan.

78.    The Sovereign Payments included (a) a wire transfer made on May 22, 2008, in the amount of $37,545.97 from Premier's bank account at Business First Bank, as well as (b) various checks, in the aggregate amount of $45,079.17, written on Premier's bank account at Community Trust Bank, each of which was paid on June 18, 2008.

79.    Moreover, from Premier's funds, Bankston and Schmidt paid in preference to Premier's other creditors those creditors whose obligations had been personally guaranteed by Bankston.

80.    At the time Bankston and Schmidt decided to make the Sovereign Payments from the Premier bank accounts, Premier did not have sufficient funds to pay its legitimate creditors, and Bankston and Schmidt knew that this was the situation.

81.    In making the Sovereign Payments and directing payments to the Bankston guaranteed obligations, Schmidt intentionally placed his and his mother's self interests above the interests of Premier, and he intentionally breached his fiduciary duties of care and loyalty to Premier.

82.    These actions of Schmidt were willful and malicious and have caused injury to Premier and its creditors, in an amount to be shown at trial.

## FOURTH CAUSE OF ACTION

### (An Additional Breach of the Duty of Loyalty; Schmidt)

83.    The Defendants in the Fourth Cause of Action is Schmidt.

84.    The Trustee incorporates the following Paragraphs of this Complaint in this Cause of Action:    Paragraphs 1 through 33; Paragraphs 32 through 39; and Paragraphs 41 through 55.

85.     According to the terms of the Premier Operating Agreement, unanimous consent among all three managers was expressly required with respect to any and all management matter and/or managerial decisions affecting Premier's business operations and affairs.

86.     In addition to the foregoing acts, Schmidt failed to follow the requirements of the Premier Operating Agreement, and therefore breached his fiduciary duties as manager to ensure that he was acting in compliance with the requirements of the Premier Operating Agreement and that Premier documents were being properly executed.

87.     Notwithstanding the foregoing provisions of the Premier Operating Agreement, in pleadings filed in court, Schmidt has admitted that he executed several significant contracts on behalf of Premier *without* the "requisite authority" to bind Premier, and that the contracts are consequently "null" such that the claims of the creditor should be "dismissed with prejudice."

88.     In addition, Schmidt executed documents for and on behalf of Premier, including a loan application, in which he represented that Bankston was Premier's **sole** member or manager.

89.     In the Second Supplemental and Amended Petition filed in the Receivership Action, Singleton and Capitol allege that, on at least two separate occasions after the Premier Operating Agreement was executed, Bankston and/or Schmidt executed loan documents/agreements and/or promissory notes on Premier's behalf, purporting to borrow large sums of money from various lenders and incurring

substantial debt Premier's behalf, without first obtaining the unanimous consent of Premier's three managers.

90.    In the Second Supplemental and Amended Petition filed in the Receivership Action, Singleton and Capitol further allege that Schmidt and Bankston breached the Premier Operating Agreement by subsequently disposing of and/or otherwise improperly reallocating Premier's assets, all without the unanimous consent of Premier's managers.

91.    In the Second Supplemental and Amended Petition filed in the Receivership Action, Singleton and Capitol further allege that Schmidt further breached the Premier Operating agreement by authorizing/agreeing to Bankston's actions of incurring debt on Premier's behalf without the proper prior authorization of all of Premier's managers.

92.    In the Second Supplemental and Amended Petition filed in the Receivership Action, Singleton and Capitol further allege that Schmidt fraudulently and tortiously misrepresented the extent of his and Bankston's ownership/membership interests in Premier and or/their authority under the Premier Operating Agreement.

93.    On numerous occasions, Schmidt and a bookkeeper in Schmidt's office signed Bankston's name to important Premier documents, both as a manager of Premier and as a guarantor of Premier obligations.  Certain of Premier's creditors have relied on documents that purport to contain Bankston's signature, both on behalf of Premier and as a guarantor, as being genuine and as being authorized by Premier.  It is still unclear, however, whether and to what extent Bankston will attempt to disavow liability for any Premier guaranties that she did not personally execute, even though she

and Schmidt created the environment whereby her name was frequently signed by others to Premier documents.

94.     Schmidt acted in concert with Bankston in executing Bankston's name to Premier documents, or having her name executed by a bookkeeper who worked under his control and supervision.  In so doing, Schmidt breached his fiduciary duties and is guilty of gross negligence and bad faith.

95.     By failing to follow the requirements of the Premier Operating Agreement, and consistently failing to exercise care in ensuring that Premier documents were properly executed, Schmidt intentionally breached his fiduciary duties to Premier, including his duty of care, and is guilty of bad faith and gross negligence.

96.     The breaches of Schmidt have caused Premier to suffer substantial and massive financial damages, for which Schmidt is liable, as set for the in the prayer herein.

## FIFTH CAUSE OF ACTION

### (Other Breaches of the Duty of Care; Singleton and Capitol)

97.     The Defendants in the Fifth Cause of Action are Singleton and Capitol.

98.     The Trustee incorporates the following Paragraphs of this Complaint in this Cause of Action:  Paragraphs 1 through 22; Paragraphs 28 and 29; Paragraphs 34 and 35; and Paragraphs 40 through 55.

99.     According to the Dissolution Petition, Singleton hired several members of his family to work as employees of Premier, and allegedly paid them exorbitant and disproportionate salaries without disclosing the family relationships to, or seeking the consent of Bankston or Schmidt.

100.    According to the Dissolution Petition, Singleton and Capitol unnecessarily acquired expensive equipment, without authority, and that equipment went unused in connection with Premier's business operations.

101.    According to the Dissolution Petition, revenues increased from Premier's beginning in August 2007 through its end in May 2008.  However, as revenue rose over those months, Singleton and Capitol intentionally, willfully, wantonly (or, alternatively, with gross negligence and disregard) drove expenses even higher.

102.    According to the Dissolution Petition, Capitol and Singleton acted without proper authority in executing leases on real property, hiring and paying personnel and obtaining unnecessary and unused equipment to the detriment of Premier and its creditors.

103.    According to the Dissolution Petition, Singleton and Capitol violated the Premier Operating Agreement and in numerous instances, and Singleton engaged in ultra vires and random unauthorized acts to the detriment of Premier and its creditors.

104.    By failing to follow the requirements of the Premier Operating Agreement, Singleton breached his fiduciary duties to Premier, including his duty of care, and is guilty of bad faith and gross negligence.

105.    The foregoing acts have caused Premier to suffer substantial and massive financial damages, for which Singleton and Capitol are liable, as set for the in the prayer herein.

## SIXTH CAUSE OF ACTION

### (Piercing the Corporate Veil; Schmidt, Singleton and Capitol)

106.    The Defendants in the Sixth Cause of Action are Schmidt, Singleton and Capitol.

107.    The Trustee incorporates Paragraphs 1 through 54 of this Complaint in this Cause of Action,

108.    At all material times, Premier was undercapitalized, in that Premier's capitalization was insufficient to support a business of its size and nature in light of the circumstances existing at the time it was initially formed and at all times thereafter.

109.    Schmidt, Bankston, Singleton and Capitol knew that Premier was undercapitalized because, among other things, no lender or significant provider of equipment (by way of example) would extend credit to Premier absent Bankston's personal guarantee.    Premier's undercapitalization is a basis for piercing the corporate veil.

110.    At all material times, Bankston had at least five (5) different unsecured lines of credit (collectively, the "Bankston Lines of Credit") at five different banks, including (a) Business First Bank, (b) First Louisiana Bank, (c) AmSouth, now known as Regions Bank, (c) BancorpSouth Bank, and (d) Iberia Bank.    Some times the Bankston Lines of Credit were used to provide capital to Premier.    On information and belief, sometimes the Bankston Lines of Credit were used to fund the operations of, or provide capital to,  the Bankston/Schmidt Related LLCs, such as Titan Health Care, LLC ("Titan Health Care").

111.   Titan Health Care, is a limited liability company that was, at all material times, jointly owned by Bankston and Schmidt.   Titan Health Care had an unsecured line of credit at a sixth bank, Red River Bank (the "Red River Line of Credit"). Bankston personally guaranteed the Red River Line of Credit.

112.   At all material times, Titan Health Care was a member of New Directions B&S, LLC ("B&S").   The other member of B&S was Rock M. Bordelon ("Bordelon").   On information and belief, B&S, a limited liability company with its registered office at 504 Texas Street, Suite 200, Shreveport, Louisiana, owns and operates intensive outpatient psychiatric therapy facilities.

113.   B&S had one or more lines of credit with Alliance Bank, now California Bank and Trust (collectively, the "B&S Lines of Credit"), which, on information and belief, were personally guarantied by Bankston.   At all material times, on information and belief, the sole Manager of B&S was Bordelon.

114.   After Premier's formation, Bankston would sometimes use the Bankston Lines of Credit as if they were Premier's lines of credit.   Through October 24, 2007, Bankston borrowed as much as $890,000 on the Bankston Lines of Credit to provide capital for Premier, and would have those funds deposited into a Premier bank account. Sometimes Bankston would use the Bankston Lines of Credit for the Bankston/Schmidt Related LLC, such as Titan Health Care.

115.   Additionally, as of October 24, 2007, Schmidt, with Bankston's approval, caused as much as $90,000 to be borrowed on the Red River Line of Credit, and deposited into a Premier bank account, to provide capital for Premier.

116.   On October 22, 2007, Premier borrowed $1,400,000 from Community Trust Bank under a line of credit that was memorialized by a promissory note, dated October 17, 2007, executed by Bankston on behalf of Premier, in an amount up to the principal amount of $2,010,000.   The $1,400,000 draw was deposited into Premier's bank account at Business First Bank, and on October 24, 2007, $1,170,000 was wire transferred to Titan Health Care.

117.   When the Trustee requested information about the large payment to Titan Health Care, the Trustee was informed that Titan Health Care had merely performed the ministerial function of paying the draws on the Bankston Lines of Credit and the Red River Line of Credit.   On information and belief, however, Titan Health Care did not immediately pay all of the draws made on First Louisiana Bank or Iberia Bank.   In fact, the Proof of Claim that Bankston filed in this Case includes a claim for amounts that Bankston purportedly borrowed under the Bankston Lines of Credit, including amounts still owed (among other banks) to First Louisiana Bank and Iberia Bank.

118.   Sometime before April 15, 2008, Titan Health Care (as a member of B&S) made draws of up to $270,000.00 on one or more of the B&S Lines of Credit, and contributed the $270,000.00 as capital to Premier.   On information and belief, these draws were made without Bordelon's prior approval or consent and did not benefit B&S.

119.   The intermingling of both the draws and payments on the Bankston Lines of Credit, the Red River Line of Credit and the B&S Lines of Credit are a basis for piercing the corporate veil, as well as finding that the Bankston/Schmidt Related LLCs were Schmidt's alter ego.

120.   The members and managers failed to hold regular meetings of the members or managers of Premier.

121.   In fact, there are no minutes of any meetings of the members of managers other than one meeting held on April 24, 2009.

122.   Failure to hold regular meetings of the members or managers of Premier is a basis for piercing the corporate.

123.   The foregoing conduct is sufficient to pierce the corporate veil as to Schmidt, Singleton and Capitol.

**WHEREFORE**, the Trustee prays that after due proceedings that there be judgment herein, in favor of the Trustee of the Estate of Premier Aggregates, LLC., and against defendants, Kevin Schmidt, Jack Singleton, and Capitol Aggregates, LLC, jointly, separately and in solido, as appropriate, as follows:

(1)   In the full and true sum of the following  claims in this Case, to the extent that the same become allowed claims:

a)   claims against Premier that Bankston guaranteed (based on the Proofs of Claim filed in this Case), including the claims of John Deere Const.& Forestry Co., Lard Oil Company, Inc., Louisiana Machinery Co., Private Lake Properties, LLC, Diversified Financial Services, Caterpillar Financial Services, J. L. Doggett, d/b/a Doggett Machinery Services, Hess Construction Company, Hess Management Firm, LLC, Jalou Corp./Cash Magic, GE Transportation, Community Trust Bank, and Altec Capital Services (collectively, the "Guaranteed Claims"), which claims total

$40,764,509.42 (based on the Proofs of Claim filed in this Case), together with (i) any late filed Proofs of Claim for claims that Bankston may have guaranteed, as this Court may allow in this Case, and (ii) interest or attorneys' fees on the principal amount of the foregoing claims;

b) the claims against Premier that Bankston did not guarantee, which claims total $2,305,235.14 (based on the Proofs of Claim filed in this Case), together with (i) any amount for the claim of Capitol Aggregates, LLC, because no amount is stated in Capitol Properties, LLC's Proof of Claim. (ii) any amount for the claim of Capitol Properties, LLC, because no amount is stated in Capitol Properties, LLC's Proof of Claim, (iii) any amount for the claim of Bayou Sand & Gravel, LLC, because no amount is stated in Bayou Sand & Gravel, LLC's Proof of Claim, (iv) any amount for the claim of Jack Singleton, because no amount is stated in Jack Singleton's Proof of Claim (all of the foregoing claims being collectively referred to as the "Non-Guaranteed Claims"), (v) any late filed Proofs of Claim for claims that Bankston did not guaranty, as this Court may allow in this Case, and (vii) interest or attorneys' fees on the principal amount of the foregoing Non-Guaranteed Claims;

(2)    the administrative expense claims of this Case, including but not limited to the fees and expenses of the professionals retained by the Trustee, the fees and expenses of the creditors that filed the

involuntary petition in this Case, and such other administrative expense claims as may be allowed in this Case;

(3)   the Sovereign Payments of $82,625.13;

(4)   The Trustee's attorneys' fees and interest on the foregoing;

(5)   all costs of these proceedings; and

(6)   such other relief as to which the Trustee may be entitled by law and equity.

Dated:  October 15, 2009

        /s/  R. Patrick Vance
ELIZABETH J. FUTRELL (LA Bar No.5863)
R. PATRICK VANCE (LA Bar No. 13008)
Jones, Walker, Waechter, Poitevent,
    Carrère & Denègre, L.L.P.
201 St. Charles Avenue, 49th Floor
New Orleans, Louisiana 70170-5100
Telephone (504) 582-8194
Telefax (504) 589-8194
Email pvance@joneswalker.com

Chapter 11 Trustee for the Estate of Premier Aggregates, LLC